# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | Criminal No. 3:10-CR-00163 |
| | ) | |
| | ) | Judge Trauger |
| [4] TIM ALLEN | ) | |
| | ) | |
| [5] ANTHONY BROOKS | ) | |
| | ) | |
| [8] KERRY PETTUS | ) | |
| | ) | |
| [10] DESHAUNE JONES | ) | |
| | ) | |
| [20] KARLOS TAYLOR | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER CONCERNING
## MOTION TO SUPPRESS TITLE III WIRETAP EVIDENCE

Defendant Anthony Brooks has submitted a Motion to Suppress Title III Wiretap

Evidence (Docket No. 685) with a supporting memorandum (Docket No. 686), in which co-

defendants Kerry Pettus (Docket Nos. 692 and 693), Deshaune Jones (Docket No. 710), Karlos

Taylor (Docket No. 714), and Tim Allen (Docket No. 828) have joined. The government

opposes the motion. (Docket No. 942.) For the reasons stated herein, the motion is **DENIED**.

## BACKGROUND

In June 2008, federal and local authorities began investigating the Nashville-area branch

of the Piru Bloods gang ("Piru Bloods"). In early 2010, federal government agents sought and

obtained four wiretaps for phones utilized by certain Piru Bloods members. The government

1

intends to utilize evidence gleaned from those wiretaps at trial against numerous defendants, including Allen, Brooks, Jones, Pettus, and Taylor ("Defendants").[1]   The Defendants seek to suppress that evidence, contending that the applications for each wiretap were facially invalid and/or substantively deficient.[2]

The government obtained the wiretaps at issue through four successive applications (hereinafter "First Application," "Second Application," *etc.*), each of which was approved by the Chief Judge of this court ("Issuing Judge") in a separate, sealed matter (hereinafter "SM Docket No. [X]").  The Issuing Judge granted authorization for wiretaps of the following telephones:

- Target Telephone 1 ("TT1") (granted March 3, 2010), a cell phone utilized by alleged Piru Bloods leader Lonnie Newsome.  (SM Docket Nos. 2-3.)[3]

- Target Telephone 2 ("TT2") (granted April 2, 2010), a cell phone utilized by alleged Piru Bloods leader Ricky Williams.  (SM Docket Nos. 8-9.)

- Target Telephone 3 ("TT3") (granted April 30, 2010), a second cell phone utilized by Williams.  (SM Docket Nos. 19-20.)

- Target Telephone 4 ("TT4") (granted May 14, 2010), a cell phone utilized by alleged Piru Bloods member William Bartlett.  (SM Docket Nos. 27-28.)

---

[1]The Defendants are each charged in the Superseding Indictment with four or more of the following crimes: conspiracy to participate in a racketeering activity; conspiracy to commit murder in aid of racketeering; assault with a dangerous weapon in aid of racketeering; possession, use, and carrying of a firearm in furtherance of and during and in relation to a crime of violence; assault resulting in serious bodily injury in aid of racketeering; assault with a dangerous weapon in aid of racketeering; conspiracy to use and carry firearms during and in relation to crimes of violence; distribution and/or possession with intent to distribute cocaine base; and conspiracy to distribute narcotics.  (Docket No. 397.)

[2]Defendant Brooks submitted a detailed memorandum supporting the motion.  Defendant Pettus submitted a supplemental brief concerning whether the application supporting the first wiretap established probable cause.  Defendants Allen, Jones, and Taylor joined the motion without reference to the record or any additional legal authority.

[3]In the Second and Third Applications, federal agents sought and obtained extensions of the TT1 wiretap.

In support of each wiretap application, the government attached both an authorization letter from the Department of Justice ("DOJ") and an affidavit from a federal agent with knowledge of the investigation. The court has reviewed the wiretap applications and supporting materials in their entirety, comprising several hundred pages of information. Due to their length, the court will reference only the most relevant facts in this order.

## ANALYSIS

### I. Standing

As an initial matter, the government contends that Brown lacks standing to challenge the First Application. Relying on case law from outside the Sixth Circuit, the government contends that an individual who was not a named interceptee or target of a wiretap must submit sworn evidence that he was heard on the wiretap to establish standing. Accordingly, the government argues that Brown, who was not named as a target until the Second Application and did not submit an affidavit that he was heard on the first wiretap, lacks standing. However, the government does not dispute that Jones actually was recorded engaging in conversations pursuant to the first wiretap. Regardless, Defendants Allen, Jones, and Pettus were named as targets in the First Application, and plainly have standing to challenge it. Accordingly, the court rejects the government's argument that the motion should be denied for lack of standing.

### II. Facial Challenge

The Defendants argue that the authorization letters for each wiretap are deficient because they appear to have been drafted by one high-ranking DOJ official, but approved by another. Under Title III, all wiretap applications must be approved by the Attorney General or a high-ranking DOJ official specially designated by the Attorney General. 18 U.S.C. § 2516(1) (2011).

Each wiretap application must specifically identify the DOJ official who authorized the application, *id.* at § 2518(1)(a), and the ultimate wiretap order must also specify the person at the DOJ who authorized the application. *Id.* at § 2518(4)(d). Suppression may be warranted if "the order of authorization or approval under which it was intercepted is insufficient on its face." *Id.* at § 2518(10)(a)(ii).

The purpose of the authorization requirement is to "insure that decisions to wiretap were made by the named officials and did not reach into the lower echelons of command." *United States v. Gray*, 521 F.3d 514, 527 (6th Cir. 2008) (internal citation omitted). This requirement "does not 'occupy a central, or even functional, role in guarding against unwarranted use of wiretapping or electronic surveillance.'" *Gray*, 521 F.3d at 528 (quoting *United States v. Chavez*, 416 U.S. 562, 578, 94 S. Ct. 1849, 40 L. Ed. 2d 380 (1974)). Thus, suppression is not required for every minor facial insufficiency in the underlying Justice Department approval. *Gray*, 521 F.3d at 522. For example, in *Gray*, the Sixth Circuit held that suppression was not warranted, even where a wiretap order and application contained several technical defects, including the alleged defect presented here. In *Gray*, the authorization letters contained text with an unsigned signature block for then-Assistant Attorney General ("AAG") Michael Chertoff, but the letters were signed by then-Deputy Assistant Attorney General ("DAAG") John Malcolm. *Id.* at 524. Also, neither the wiretap applications nor the court's approval orders identified the official who had authorized the application. *Id.* The defendants argued that suppression was warranted on the basis that it was ambiguous which DOJ official had actually approved the applications. *Id.* The Sixth Circuit disagreed and found that the letters satisfied Title III's requirements. In reaching this decision, the court stated that "suppression is not warranted . . . when a wiretap application or

order either misidentifies a DOJ official who could not legally authorize the wiretap or. . . identifies no official at all, *so long as the record shows that a statutorily designated official actually gave the authorization*." *Id.* at 526 (emphasis added).

Here, the authorization letters plainly satisfy the *Gray* standard. Although each authorization letter was styled "From" Lanny A. Breuer (Criminal Division AAG), each letter was signed and dated by a DAAG - *i.e.*, someone other than AAG Breur - just a day or two before each wiretap application was made.[4] (*See, e.g.*, SM Docket No. 1, Ex. 2.) Each letter accurately recites the cell phone number(s) and investigatory targets of the associated wiretap. Thus, similar to the authorization letters upheld in *Gray*, the authorization letters here were apparently drafted by AAG Breuer but, after tailoring to the specific wiretap application, were approved by a duly authorized DAAG. Furthermore, each application and the associated court order explicitly reference the DAAG who signed the underlying authorization letter, thereby avoiding two of the technical defects present in *Gray* that the Sixth Circuit found were excusable in any case.

## III.   Substantive Challenges

The Defendants assert two substantive challenges to the wiretap applications. First, they contend that the government failed to demonstrate that a wiretap was necessary, in violation of 18 U.S.C. § 2518(1)(c). Second, they contend that the government failed to establish probable cause. The government argues that it satisfied these requirements.

### (A)   Legal Standard

---

[4]DAAG Jason A. Weinstein signed and dated the authorization letters supporting the First and Fourth Applications, DAAG Bruce C. Swartz the letter supporting the Second Application, and DAAG Kenneth A. Blanco the letter supporting the Third Application. The defendants do not dispute that these DAAGs had authority to approve the wiretaps.

In analyzing whether the government met the necessity and probable cause requirements under Title III, the court must accord "great deference" to the determination of the issuing judge. *United States v. Corrado*, 227 F.3d 528, 539-40 (6th Cir. 2000) (applying standard to necessity analysis); *United States v. Alfano*, 838 F.2d 158, 162 (6th Cir. 1988) (applying standard to probable cause analysis). Thus, "the fact that a later trial judge or reviewing court may feel that a different conclusion was appropriate does not require, nor even authorize, the suppression of evidence gained through such a warrant." *Corrado*, 227 F.3d at 539 (quoting *Alfano*, 838 F.3d at 162). Accordingly, "neither a trial judge nor an appellate court may exclude evidence gathered under a lawfully issued warrant solely on the basis that those judges would not have issued the warrant had they been in the magistrate's place." *Alfano*, 838 F.2d at 163.

In analyzing an affidavit in support of a search warrant, "courts should review the sufficiency of the affidavit in a commonsense, rather than hypertechnical manner." *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001). Thus, the court should not consider paragraphs of the affidavit in isolation, but instead should analyze whether the facts presented in the affidavit, read as a whole, provide the requisite basis for the issuing judge's decision. *United States v. Landmesser*, 553 F.2d 17, 19-21 (6th Cir. 1977).

(B)    <u>Supporting Affidavits</u>

Each application is supported by an affidavit from a Special Agent from the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") involved in the ongoing criminal investigation, as follows:

- <u>First Affidavit</u>:  The affidavit of special agent Kyle Mark Himel supporting the First Application (SM Docket No. 2) ("First Affidavit") comprises 58 pages, including 115 paragraphs.

- <u>Second Affidavit</u>:  The affidavit of special agent Himel supporting the Second Application (SM Docket No. 8) ("Second Affidavit") comprises 44 pages, including 77 paragraphs.

- <u>Third Affidavit</u>:  The affidavit of special agent Mickey French supporting the Third Application (SM Docket No. 19) ("Third Affidavit") comprises 47 pages, including 79 paragraphs.

- <u>Fourth Affidavit</u>: The affidavit of special agent French supporting the Fourth Application (SM Docket No. 27) ("Fourth Affidavit") comprises 45 pages and 76 paragraphs.

Each affidavit contains a summary of the Special Agent's background and qualifications,[5] detailed information concerning the operation of the Piru Bloods gang, the identities of individuals expected to be intercepted through the wiretap(s), a list of the crimes that the target subjects allegedly had committed or would commit (either directly or by aiding and abetting), a description of the information provided by and/or activities undertaken to support the investigation by multiple confidential sources, a description of any recorded discussions involving investigatory targets (consensual or otherwise), a telephone toll record analysis, a stated basis for the need for interception of wire communications, a description of the non-wiretap means undertaken in the investigation, a description of why certain investigative techniques were not undertaken, and information regarding minimization.

(1)     First Affidavit

The First Affidavit establishes that the investigation of the Piru Bloods began in June

---

[5]According to their affidavits, Special Agents Himel and French are experienced ATF field officers who, prior to filing the applications at issue here, had participated in numerous long-term, complex investigations of organized groups, including criminal street gangs, that commit narcotics, firearms, and violent offenses.  (*See, e.g.*, First Affidavit ¶ 2; Third Affidavit ¶ 2.)  In the course of these investigations, they became familiar with and utilized a variety of investigative techniques, including the development of cooperating sources, source debriefings, physical surveillance, telephone toll analysis, and electronic surveillance.  (*Id.*)

2008, when the Metropolitan Nashville Police Department developed a confidential source, a Piru Bloods member identified as "CS-6," who provided the police with information linking the Piru Bloods to a recent homicide. (First Affidavit ¶ 14.) The Piru Bloods are a gang that originated in Los Angeles, California before breaking into individual branches, or "sets," including the so-called "Piru Bloods" in Compton, California. (*Id.* ¶¶ 8-9.) Sets of the Piru Bloods emerged in other parts of the country, including Tennessee. (*Id.* ¶ 9.) The investigation in this case broadly concerned the alleged criminal activities of certain Tennessee-based Piru Bloods sets (*id.* ¶ 9-16), which, for purposes of this motion, are collectively referred to as the "Piru Bloods." In particular, the investigation initially focused on the Nashville-based sets of the Tree Top Pirus, led by Newsome (*Id.* ¶¶ 12, 17(a)) and the Eastside Skyline Pirus, led by Williams (*Id.* ¶ 17(h)). The First Affidavit asserted that, although each of these sets retained a distinct hierarchy, their criminal activities overlapped, including joint meetings led by Newsome and Williams (*id.* ¶ 63). The affidavit also alleged that Williams and Newsome, the leaders of the two affiliated Piru Bloods sets in Nashville, engaged in criminal activities together in person (*see, e.g.*, *id.* ¶¶ 51-52) and were in frequent contact over the phone (*id.* ¶ 71.)

In the course of the investigation preceding the First Affidavit, the government utilized six confidential sources to gather information (hereinafter "CS-1," "CS-2," *etc.*). These included one current Piru Bloods member, CS-6, as well as former members and members of rival gangs.[6] CS-1, a rival gang member, contended that Newsome was involved in narcotics trafficking with Pettus and others and that the Piru Bloods had engaged in violent acts of retribution, including

---

[6]Contrary to Brooks's contentions, the affidavit plainly indicates the dates on which confidential source interviews occurred, as well as the information gleaned during those interviews.

murder. (*Id.* ¶¶ 21, 51-53.) CS-2, incarcerated when the affidavit was filed, was a rival gang

member who claimed to have firsthand knowledge concerning a reprisal killing by the Piru

Bloods. (*Id.* ¶¶ 22-23, 32-36, 91.) CS-3 claimed to have knowledge concerning a separate

reprisal killing by Piru Bloods members (*id.* ¶¶ 53-54), although the affidavit does not state

whether CS-3 had any Piru Bloods affiliation. CS-4 was a Bloods member from another

jurisdiction[7] whom law enforcement transplanted to the Nashville area to infiltrate the Piru

Bloods, although the effort was unsuccessful for unspecified reasons. (*Id.* ¶ 25.) CS-5,

incarcerated when the affidavit was filed, was a member of the "Skyline Piru Bloods" –

presumably another local-area Piru Bloods set – from April 2007 forward, who claimed to have

knowledge concerning another Piru Bloods reprisal killing that involved both Williams and

Newsome. (*Id.* ¶¶ 26, 43, 94.) CS-6, the government's chief informant, was a current Nashville-

area Eastside Skyline Piru Bloods member with firsthand knowledge concerning the activities of

the Piru Bloods, including Piru Bloods reprisal killings, drug trafficking, violent initiation rites,

and use of firearms in furtherance of their operations. (*See, e.g., id.* ¶¶ 28, 29, 31, 40-42, 44, 56.)

The confidential sources provided, *inter alia*, accurate information linking the Piru Bloods

to at least three homicides and speculative information linking the Piru Bloods to a fourth

homicide, as follows:

- Pullen Homicide (May 19, 2006): CS-2 and CS-6 provided firsthand
  information describing how, at the direction of their Eastside Skyline Piru
  Bloods faction leader, Defendant Allen and others shot to death a member
  of a rival faction, Martin Pullen, then fled the scene of the crime with CS-2,
  and were ultimately promoted within the gang for these killings at a
  meeting in which CS-6 participated. (*Id.* ¶¶ 30-38.)

---

[7]The affidavit states that CS-4 was a "Bloods" member, but does not indicate that he/she
was a "Piru Bloods" member.

- Goins Homicide (June 14, 2008): CS-5 and CS-6 provided firsthand accounts that Piru Bloods members shot to death a member of a rival gang, Michael Goins, who had allegedly shot one of Newsome's subordinates, Anthony Lampkins. (*Id.* ¶¶ 39-43.) Both CS-5 and CS-6 contended that they overheard Newsome identify Goins, after which the shooting occurred. (*Id.*) After CS-6 claimed to know the location of one of the murder weapons, CS-6, at the direction of investigators, engaged in a controlled purchase of this firearm at referenced location, which investigators then linked to the Goins homicide through the the National Integrated Ballistics Information Network ("NIBIN"). (*Id.* ¶¶ 42.) Furthermore, on a tip from CS-6, authorities executed a search warrant at the house of a Piru Bloods gang member, leading to the seizure of a second firearm that authorities confirmed had been used to shoot Goins through the NIBIN. (*Id.* ¶¶ 44-46.)[8]

- Franklin Homicide (July 4, 2008): CS-1 and CS-3 provided information that Newsome, Williams, and two other Piru Bloods members committed a "drive-by" shooting of the victim, Alexandra Franklin, who was the girlfriend of an individual with whom Williams and Newsome had an ongoing violent dispute. (*Id.* ¶ 51-52.) Investigators independently verified certain details of CS-1's account. (*Id.* ¶ 52.) CS-3 also contended that, one week after the homicide, Williams brought a bag of firearms to the residence of Eastside Skyline Pirus member Joedon Bradley, intending for CS-3 and Bradley to hide the firearms, which CS-3 believed were associated with the Franklin homicide. (*Id.* ¶ 53.) Approximately three weeks later, police executed a narcotics-related search warrant at the residence of another Eastside Skyline Piru Bloods member, at which Bradley was present at the time of the search. (*Id.* ¶ 54.) Incident to that search, investigators recovered a pistol that investigators linked to the Franklin homicide through the NIBIN. (*Id.*)

- Campbell Homicide (July 23, 2008): CS-3, CS-5, and CS-6 claimed to have knowledge of the homicide of Darsean Campbell, who was shot to death in Nashville in July 2008. (*Id.* ¶ 47-49.) CS-6 stated that Campbell was a member of a rival gang, and both CS-3 and CS-5 believed that Tree Top Piru Bloods member Gaddie had shot Campbell (*id.*), although the affidavit does not state the basis for their beliefs.

---

[8]The First Affidavit asserts that, at the execution of the warrant at this residence, the residents fled into the house, locked themselves inside, and attempted to hide the firearms in a closet space on an upper floor, at the direction of defendant Tree Top Piru Bloods member Kenneth Gaddie. (*Id.* ¶¶ 44-45.)

In addition to procuring evidence regarding these homicides, law enforcement utilized the confidential sources in other ways.  For instance, the government transplanted CS-4 to Nashville in an attempt to have CS-4 infiltrate the Piru Bloods, but this effort failed for unspecified reasons. (*Id.* ¶ 25.)  Also, pursuant to a tip by CS-6 that defendant Jones and other Piru Bloods members were engaged in drug trafficking, in August 2009, law enforcement utilized CS-6 to perform a controlled purchase of cocaine from defendant Jones, which CS-6 set up through telephone discussions with Jones and performed under law enforcement supervision.  (*Id.* ¶¶ 55-58.)  CS-6 alleged that Newsome had been provided security services for Anthony Bryant, a convicted narcotics trafficker, to assist Bryant in ongoing distribution of narcotics.  (*Id.* ¶ 55.)  CS-6 also alleged that Newsome was performing similar services for Tree Top Pirus member James House. (*Id.*)  Finally, CS-6 assisted authorities in tracking telephone numbers relating to Newsome and wore a concealed recording device while participating in a January 2010 joint Piru Bloods meeting run by Newsome and Williams, in which Williams ordered CS-6 to pay Jones $2,500 for a prior drug debt.  (*Id.* ¶ 63.)

With respect to Newsome's telephone numbers, the government engaged in a series of efforts to obtain information through pen registers, trap and trace analysis, and consensually recorded phone calls, with assistance from CS-6.  (*Id.* ¶¶ 59-62.)  However, Newsome frequently changed phones, thereby frustrating efforts to obtain timely information through traditional investigative means.  (*Id.*)  For example, in an eight-month period between April 28, 2009, and December 8, 2009, Newsome changed cell phones three times, outpacing the government's efforts to obtain timely pen register data from the relevant service providers and to conduct consensually recorded and monitored calls.  (*Id.*)  Finally, in January 2010, the government was

able to monitor two consensually recorded phone calls with Newsome on the fourth cell phone, in which Newsome provided Williams' cell phone number and outlined payment terms for the drug debt referenced in the January 2010 meeting that CS-6 had recorded. (*Id.* ¶¶ 64-65.) However, in February 2010, Newsome discarded his cell phone yet again. (*Id.* ¶ 66.) CS-6 then provided authorities an updated cell phone number for Newsome, TT1. (*Id.*) Thereafter, in a consensually recorded phone call with CS-6, Jones confirmed the payment terms that Newsome had outlined to CS-6. (*Id.* ¶ 67.) CS-6 then placed a consensually recorded call to Newsome at TT1, in which Newsome acknowledged payment of the drug debt to Jones and mentioned that the Piru Bloods were likely going to engage in a fight that night at a club. (*Id.* ¶ 68.)

In addition to procuring evidence through confidential sources, the government undertook other traditional investigative techniques before filing the First Application. For instance, it conducted a telephone toll analysis of TT1, which demonstrated that Newsome was frequently in contact with known Piru Bloods members and narcotics dealers, including, *inter alia*, Williams and Jones. (*Id.* ¶¶ 69-72.) The government also attempted to conduct physical surveillance of Newsome, with limited success. Two recent attempts to conduct physical surveillance of Newsome's residence had to be abandoned because the agents were attracting the attention of local residents. (*Id.* ¶¶ 80-81.) Also, the government installed a pole camera outside an alleged Piru Bloods meeting house, but this external surveillance was of limited value because the meetings typically took place inside the building. (*Id.* ¶ 83.)

The First Affidavit also states that various other investigative measures had been considered but not attempted, for the following reasons:

- Pen Registers: In the agent's experience, pen registers and toll analysis are of limited value in investigating street gangs because the phones may be

registered under fictitious names, the user may not be the same as the subscriber, and prepaid cell phone records do not require accurate name or address information.  Furthermore, Newsome's phone usage had proven particularly difficult to track through pen registers because he discarded his telephone number frequently.

- Grand Jury Subpoenas:  Based on the agents's experience, grand jury subpoenas would not be effective.  Gang members likely would give untruthful information and/or invoke their Fifth Amendment privilege not to testify.  Immunity would be undesirable because it could require immunization of the conspiracy's most culpable members to obtain the necessary information.  Furthermore, service of grand jury subpoenas would alert target subjects to the investigation, causing them to be more cautious, and/or to flee, to threaten informants, or otherwise compromise the investigation.

- Confidential Sources:  The confidential sources provided accurate and actionable information, but all except for CS-6 had met their practical limitation in providing assistance to the investigation.  CS 1 was a member of a rival gang with no current knowledge of the Piru Blood's current activities; CS-2 possessed only historical information; CS-3 possessed only historical information and was currently incarcerated; CS-4 resided outside Tennessee and possessed no information regarding the Piru Bloods; and CS-5 possessed no current information.  As to CS-6, CS-6 was a low-ranking member of one set of the Piru Bloods who was not privy to the full nature and extent of the gang's criminal activities.

- Undercover Agents:  Based on the agent's experience, criminal street gang members are inherently suspicious of individuals they do not know, particularly in the context of insular groups like the Piru Bloods.  Furthermore, even if an agent could infiltrate the organization, it would be difficult to protect that individual, particularly if the Piru Bloods searched that individual for a weapon and/or recording device.

- Consensual Recordings:  Although CS-6 had engaged in consensually recorded discussions with Newsome, the recordings were of limited value in gaining the desired evidence.  CS-6 occupied only a limited role in the Piru Bloods and further attempts by CS-6 to engage Newsome and others in recorded calls could have compromised the investigation and/or endangered CS-6's life.  Other than CS-6, the government did not have any confidential sources with access to Newsome or other members of the Piru Bloods.

- Interviews of Witnesses or Subjects/Arrest Warrants:  The most

knowledgeable subjects are also participants in the crimes under investigation, would be unlikely to cooperate, and might have alerted the other members of the organization to the existence of the investigation, resulting in the possible destruction of documents and other evidence. Moreover, if an interviewee ascertained the identity of a cooperating source, that source could face retaliation.

- <u>Search Warrants</u>:  Based on the affiant's experience, the execution of search warrants would not generate sufficient evidence to determine the full nature and scope of the criminal conspiracy, the participants, or their methods of operation.  Moreover, execution of search warrants would tip off targets of the investigation, causing them to curtail or conceal their activities, thereby bringing the investigation to a premature conclusion. Although investigators had identified certain residences utilized by Newsome and the Piru Bloods, they had not yet identified the locations utilized for planning violent acts.  Execution of search warrants would be more productive at the conclusion of the investigation, once all the locations had been identified and the goals of the investigation substantially achieved.

- <u>Trash Searches</u>:  Newsome lived in an apartment complex with a high frequency of narcotics trafficking, in which the residents utilized a common area for trash, thereby rendering trash searches impractical.  Also, the area contained a high traffic volume, posing a risk that Newsome would have been tipped off to the investigation if agents searched the trash. Regardless, in the agent's experience, trash searches are unlikely to yield evidence of criminal activity, because narcotics traffickers typically destroy potentially incriminating evidence and rarely use trash containers to dispose of incriminating materials.

(*Id.* ¶¶ 84-104.)

(2)     Second Affidavit

The Second Application added six new "targets" to the investigation, about whom the Second Affidavit provided background information concerning their Piru Bloods affiliations and criminal histories.  (Second Affidavit ¶¶ 17(m)-(r).)  The Second Affidavit incorporated the First Affidavit (*id.* ¶ 21) and added information gleaned from the recorded calls, which included evidence reflecting, *inter alia*, a robbery by Newsome of an expelled Piru Bloods member (*id.* ¶

25); Williams' efforts to broker a dispute concerning one member threatening to murder another (*id.* ¶ 23); an individual informing Newsome that he intended to shoot two people in a retaliatory killing, for which Newsome directed the individual to Brooks for ammunition (*id.* ¶ 26); Newsome and Williams' accurate suspicions that police were physically surveilling them in unmarked vehicles (*id.* ¶ 27); Jones informing Newsome that he shot a rival gang member, which independent investigation confirmed had occurred (*id.* ¶ 28); a discussion concerning an independently confirmed shooting (*id.* ¶ 29); Newsome's provision of rifle ammunition to support an Eastside Skyline Piru Bloods member's request to retaliate against members of a rival gang (*id.* ¶¶ 28-29); and Newsome's and Williams' intent to "knock off" a Piru Bloods gang member believed (incorrectly) to be a police informant (*id.* at ¶ 31).

With respect to non-wiretap investigative techniques, the Second Affidavit added supplemental information concerning certain techniques, as follows:

- <u>Toll Analysis</u>:  A telephone toll analysis for TT2 demonstrated that Williams was in contact with various convicted felons who had been recorded discussing gang-related activities with Newsome on TT1.  (*Id.* ¶¶ 33-35.)

- <u>Physical Surveillance</u>:  Recent physical surveillance of Williams and Newsome failed because they became aware of the tail.  (*Id.* ¶ 43.)

- <u>Confidential Sources</u>:  CS-6 had to be abandoned as an informant because of his continued participation in gang-related activity.  (*Id.* ¶ 51.)

- <u>Consensual Recordings</u>:  The loss of CS-6 left authorities no practical means of engaging Williams, Newsome, or other Piru Bloods members in consensually recorded telephone calls.  (*Id.* ¶ 59.)

- <u>Trash Searches</u>:  Investigators identified a residence belonging to another person where Williams resides but stated that Williams frequently moves between residences, reducing the likelihood that a trash search at the one residence would yield evidence of criminal activity.  (*Id.* ¶¶ 64-66.)

(3) Third Affidavit

The Third Application added six more targets to the investigation, for which the Third Affidavit provided background information concerning their Piru Bloods affiliations and criminal histories. (Third Affidavit ¶¶ 17(s)-(x)). The second wiretap had recorded, *inter alia*, Newsome discussing with Jones a robbery by an Eastside Skyline Piru Bloods member (*id.* ¶ 26); Newsome discussing with Pettus the potential reprisal killings of rival gang members (*id.* ¶ 24); a Tree Top Piru Bloods member discussing police questioning of an individual to "build a case" on Newsome, expressing that individuals questioned by investigators should "cool down" (*id.* ¶ 25); Williams and Pettus discussing the distribution of narcotics (*id.* at ¶¶ 27 and 32); Newsome and Williams discussing providing a gun to Piru Bloods member to "follow" someone who had robbed that member (*id.* ¶ 29); Newsome and Williams (on TT3), discussing law enforcement attempts to question Newsome's father regarding gang activity, which the father had relayed to Newsome, and expressing concern about a "leak" within the Piru Bloods (*id.* at ¶ 30); and Williams and Newsome discussing "x'ing off" certain Piru Bloods members (*id.* ¶ 31).

With regard to non-wiretap techniques, the Third Affidavit added the following:

- Telephone Toll Analysis: A telephone toll analysis for TT3 demonstrated that Williams was in frequent contact with known Piru Bloods gang members and narcotics traffickers, including recent discussions on TT2 (a separate Williams cell phone) regarding narcotics trafficking (*id.* ¶ 35) and establishing a Chattanooga branch of the Piru Bloods. (*Id.* at ¶¶ 36-37).

- Physical Surveillance: Investigators again attempted to conduct physical surveillance of Newsome and Williams, but Williams identified the police presence at a scheduled meeting with Newsome and, therefore, refused to meet with Newsome at his residence. (*Id.* ¶ 45.)

- Confidential Sources: CS-6 continued to be involved in unauthorized gang-related criminal activity and, therefore, could no longer be proactively utilized. (*Id.* ¶ 53.)

16

- Trash Searches: Newsome moved to a new apartment in the same complex as his previous residence, which, as before, utilized a common area for trash, had a high degree of narcotics trafficking, and had a lot of foot traffic, thereby rendering trash searches impractical. (*Id.* ¶ 68.)

(4)     Fourth Affidavit

The Fourth Affidavit added three new targets to the investigation, for which the affiant provided background information concerning their Piru Bloods affiliations and criminal histories. (Fourth Affidavit ¶¶ 17(y)-(aa).) The Fourth Application sought to intercept communications on the telephone belonging to William Bartlett, a leader of the Eastside Skyline Piru Bloods living in Gallatin, who allegedly was conspiring with Williams to set up a Chattanooga branch of the Piru Bloods. (*Id.* ¶¶ 21, 25.) According to the Fourth Affidavit, previous wiretaps and investigation had adduced the following information concerning Bartlett: Bartlett is the leader of Gallatin set of the Eastside Skyline Pirus (¶¶ 25, 37); certain of Bartlett's relatives, who are incarcerated, were founding members of the Piru Bloods in Tennessee (¶ 25); Bartlett and Newsome discussed a violent dispute between a Piru Bloods member and a rival gang member (*id.* at ¶ 26); Bartlett and Newsome discussed a Piru Bloods meeting in which certain members failed to participate because they expected to be beaten at the meeting for violating gang rules (*id.* at ¶ 27); and Williams and Bartlett discussed running a Chattanooga branch of the Piru Bloods and setting up a rank structure for it (*id.* at ¶¶ 25, 28-29), in which any "calls" would "come through us." (*Id.* ¶ 28.) The Fourth Affidavit also incorporated the prior affidavits, which had established that Bartlett and Williams (the leader of the Nashville Eastside Skyline Pirus) were in frequent telephone contact. (Second Affidavit ¶ 34.)

The affidavit also indicated that three new confidential sources were developed. CS-7, a

member of the Eastside Skyline set of the Nashville Piru Bloods (headed by Williams), provided information that Williams was seeking to organize a Chattanooga branch of the Eastside Skyline Piru Bloods and that a meeting involving both Nashville and Chattanooga members would be taking place. (Fourth Affidavit ¶ 21.) CS-7 may also have informed authorities that this branch would be engaged in illegal narcotics trafficking. (*Id.* ¶ 21.)[9] CS-8, a member of the Tree Top set of the Nashville Piru Bloods (headed by Newsome), stated that he/she could obtain photographs of Piru Bloods members illegally possessing firearms and illegal narcotics and could assist law enforcement in identifying Piru Bloods members. (*Id.* ¶ 22.) CS-9, a member of the Athens Park Bloods in Gallatin, Tennessee, stated that he/she could provide information concerning this branch of the Piru Bloods and could engage in controlled purchases of narcotics from high-ranking members, although CS-9 ultimately refused to cooperate with investigators. (*Id.* ¶ 23.)

With respect to non-wiretap investigative techniques, the Fourth Affidavit added the following information:

- <u>Telephone Toll Analysis</u>: Bartlett was recently in telephone contact with known gang members and narcotics dealers. (*Id.* ¶ 30.) One of those contacts was Donald Dowell, a member of the Nashville set of Eastside Skyline Pirus who himself had recently engaged in incriminating conversations with Newsome, in which Dowell requested ammunition from Newsome to shoot rival gang members (*id.* ¶ 31). Dowell was also recorded discussing Piru Bloods members receiving rank in jail for fighting rival gang members. (*Id.*.) Another of Bartlett's recent contacts was Allen, an Eastside Skyline Piru Bloods member who had recently engaged in a potentially incriminating conversation with Newsome, in which he urged Newsome not to conduct a meeting with Williams and other Tree Top Pirus and Eastside Skyline Pirus members because of suspected police surveillance. (*Id.* ¶

---

[9]The affidavit states that, based on his/her involvement with Williams, CS-7 "provided information regarding illegal narcotics trafficking and an upcoming PIRU gang meeting to be held in Nashville and Chattanooga." (*Id.* ¶ 21.) It is unclear from the wording of this statement whether the information concerning "illegal narcotics trafficking" specifically related to the Chattanooga set of Piru Bloods that Williams and Bartlett were organizing.

32).

- Physical Surveillance:  Attempts to conduct physical surveillance of Bartlett were unsuccessful because Bartlett was not found at either of his listed residential addresses.  (*Id.* ¶ 40.)  Authorities attempted to conduct surveillance of Bartlett at his place of work but met with "negative results" for unspecified reasons.  (*Id.* ¶ 40.)  Furthermore, authorities did not have a confidential source within Bartlett's set of Piru Bloods that could provide information about when and where meetings would take place.  (*Id.* ¶ 42.)  Separately, an attempt to conduct physical surveillance of Newsome's residence while Newsome was away was unsuccessful because agents were observed by an individual who appeared to be operating as a lookout for Newsome.  (*Id.* ¶ 40.)

- Confidential Sources:  CS-7 was not in a position to provide information regarding Bartlett or his set of Piru Bloods or infiltrate that group in order to get close to Bartlett.  (*Id.* ¶¶ 53.)  CS-8 was not in a position to infiltrate Bartlett's set of the Piru Bloods or provide information regarding Bartlett's gang activity and leadership.  (*Id.* ¶ 54.)  CS-9 refused to cooperate with authorities and could no longer be used.  (*Id.* ¶ 55.)  Furthermore, none of the confidential sources (including CS-1 through CS-6) had provided information regarding the activities or involvement of Bartlett in the Piru Bloods.  (*Id.* ¶ 46.)

- Consensual Recordings:  Investigators did not have a confidential source with access to Bartlett who could make consensual recordings without compromising the investigation or endangering his/her safety.  (*Id.* ¶ 58.)

- Search Warrants:  Investigators had not identified the locations used by Bartlett to discuss and plan gang-related violent acts.  (*Id.* ¶ 62.)

- Trash Searches:  Two potential residences of Bartlett were located within a public housing complex with high traffic, raising the possibility of detection.  (*Id.* ¶ 63.)

     (C)    <u>Necessity</u>

Title III requires that an application for a wiretap order contain a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  *United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002) (quoting 18 U.S.C. § 2518(1)(c)).  This statutory

requirement is designed "to ensure that a wiretap 'is not resorted to in a situation where traditional investigative techniques will suffice to expose the crime.'" *Alfano*, 838 F.2d at 163 (quoting *United States v. Kahn*, 415 U.S. 143, 152 n.12, 94 S. Ct. 977, 39 L. Ed. 2d 225 (1974)). The Sixth Circuit has defined the relevant standard for assessing the adequacy of the "needs statement" in an application as follows:

> Wiretaps are not to be used thoughtlessly or in a dragnet fashion. As our court has said, *what is needed is to show that wiretaps are not being routinely employed as the initial step in criminal investigations.* However, the government is not required to provide that every other conceivable method has been tried and failed or that all avenues of investigation have been exhausted.

*United States v. Giacalone*, 853 F.2d 470, 480 (6th Cir.1988) (quoting *Alfano,* 838 F.2d at 163) (internal citations and quotations omitted) (emphasis added). A wiretap need not be used only as a last resort. *Landmesser*, 553 F.2d at 20. Thus:

> All that is required is that the investigators give serious consideration to the non-wiretap techniques prior to applying for wiretap authority and that the court be informed of the reasons for the investigators' belief that such non-wiretap techniques have been or will likely be inadequate.

*Giacalone*, 853 F.2d at 480 (quoting *Alfano*, 838 F.2d at 163-64). At the same time, "[w]hile the prior experience of investigative officers is indeed relevant in determining whether other investigative procedures are unlikely to succeed if tried, a purely conclusory affidavit unrelated to the instant case and not showing any factual relations to the circumstances at hand would be inadequate compliance with the statute." *United States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007) (quoting *Landmesser*, 552 F.2d at 20). In determining whether an application meets the necessity requirement, a "reasonable statement of the consideration or use of other investigative means is adequate." *Alfano*, 838 F.2d at 164. The court must evaluate the showing "in a practical and common sense fashion." *Landmesser*, 553 F.2d 17, 19-20 (6th Cir. 1977).

Here, the government made the requisite showing. The investigation proceeded over an 18-month period before the government filed the First Application for a wiretap. That investigation included both live and electronic physical surveillance, a controlled drug purchase, a controlled firearms purchase, an attempt to transplant a confidential source to infiltrate the organization, multiple consensually recorded phone calls, warrant-based searches of at least two locations affiliated with Piru Bloods-related criminal activity, the development of multiple confidential sources, toll analysis, multiple attempts to trap and trace Newsome's cell phones, and ballistics investigation, among other efforts. Subsequent affidavits provided relevant updated information concerning the ongoing investigation. Plainly, the wiretap requests concerning these applications were not made as the "initial step" in the government's investigation of the Piru Bloods.

Furthermore, the First, Second, and Third Affidavits provided the issuing judge with a substantial explanation of the limits on non-wiretap investigative techniques that were undertaken. For example, the First Affidavit provides case-specific facts detailing the limitations on physical surveillance of Newsome personally and of an alleged meeting house, the difficulty in utilizing pen registers because Newsome frequently changed phones, the limitations on the ability of the investigation's confidential sources to conduct effective consensually recorded telephone calls with principals of the conspiracy, and the futility of conducting trash searches at Newsome's residence in a highly trafficked apartment complex with a common trash area. The subsequent affidavits provide similar information concerning the named interceptees for each wiretap.

Similarly, the affiants' detailed statements concerning the techniques that were considered, but not attempted, also demonstrate "serious consideration" of the use of alternative

21

investigative techniques. As other courts within the Sixth Circuit have found under similar circumstances, the court may rely on the reasoned judgments of an appropriately experienced affiant that the use of certain techniques, including grand jury subpoenas, the issuance of search warrants and arrest warrants, undercover agents, and witness interviews, risk compromising the entire investigation by tipping off the subjects of the potential investigation and/or would not general truthful information. *See, e.g., United States v. Haque*, 315 Fed. App'x 510, 518 (6th Cir. 2009) (upholding wiretap where authorities utilized confidential informants, pen registers, trap and trace, and physical surveillance, but did not utilize undercover agents or a grand jury investigation because those methods were "unlikely to uncover the information the FBI was after and, moreover, risked tipping off the targets to the investigation"); *United States v. Walkup*, 2010 WL 4778788, No. 1:09-CR-00026-R, at *1-*4 (W.D. Ky. Nov. 16, 2010); *United States v. Hawk*, 2007 WL 3118365, No. 3:05CR-151-S, at *1-*5 (W.D. Ky. Oct. 22, 2007); *United States v. Kelley*, 596 F. Supp. 2d 1132, 1143-48 (E.D. Tenn. 2009); *Unites States v. Hazelwood*, 2011 WL 2553265, at *5-*9 (N.D. Ohio. June 28, 2011).[10] Similarly, the court may rely on the affiant's reasonable belief that certain investigatory techniques, such as consensually recorded phone calls, a grand jury investigation, telephone toll analysis, and trash searches, would not generate the necessary information, even if they did not tip off the investigatory subjects. *See Walkup*, 2010

---

[10]Indeed, the affiants' beliefs here may have been well-founded. Piru Bloods members sought to conceal a murder weapon when police attempted to effectuate a search warrant (First Affidavit ¶ 45), Williams and Newsome became aware of physical surveillance efforts and may have sought to "knock off" a suspected police informant (Second Affidavit ¶ 31), Newsome's father alerted Newsome to police questioning concerning potential gang activity by Newsome (Third Affidavit ¶ 30), Newsome and Williams became concerned about a potential "leak" in their organization (*id.*), and Allen advised Newsome not to conduct a joint Piru Bloods meeting with Williams because of suspected police surveillance (Fourth Affidavit ¶ 32).

WL 4778788, at *1-*4; *Hawk*, 2007 WL 3118365, at *1-5; *Kelley*, 596 F. Supp. 2d at 1143-48; *Hazelwood*, 2011 WL 2553265, at *5-9.

Although it is arguable whether the government exhausted all available alternative investigative techniques before applying for a wiretap, it was not required to do so. Thus, taking into consideration the great deference owed to an issuing judge's decision, the court finds that the Issuing Judge was presented with substantial facts demonstrating that the government met the necessity requirement as to the First, Second, and Third Applications.

The Fourth Application is a somewhat closer call. Unlike the previous three applications, which related to Newsome and Williams, the Fourth Application sought communications involving Bartlett, a member of a separate branch of the Piru Bloods outside of Nashville. The affidavit does not articulate any inherent problems with conducting physical surveillance of Bartlett at his place of work. Furthermore, it contains no indication that Bartlett frequently changed cell phones, which in part justified the prior applications as to Newsome, nor does it provide any indication that the government sought to engage Bartlett in consensually recorded phone calls through one of its confidential sources. On the other hand, the affidavit indicates that the government adduced what evidence it could from CS-7 regarding the Chattanooga branch of the Piru Bloods; explains how Bartlett's failure to provide accurate information concerning his residence rendered physical surveillance of his residence impossible; details how, even if these addresses were accurate, trash searches would risk detection; and explains that the two viable confidential sources were not in a position to infiltrate's Bartlett's unit of the Piru Bloods or to provide information concerning his gang-related activity and leadership. Furthermore, there appear to be plausible reasons why the confidential sources were not in a position to engage in

23

consensually recorded phone calls: CS-7 was not a member of Bartlett's set of the Piru Bloods, CS-8 does not appear to have provided any information regarding Bartlett in the first place, and CS-9 ultimately refused to cooperate with investigators at all. Under these circumstances, the court finds that, granting great deference to the Issuing Judge's decision, the government made the requisite minimal showing of necessity in support of the Fourth Application.[11]

(D)     Probable Cause

To establish probable cause for a wiretap, the issuing judge must determine whether the facts alleged in the application create probable cause to believe that: (1) an individual has committed, is committing, or is about to commit the offense charged; (2) communications concerning the offense will be obtained through the requested surveillance; and (3) the location of the electronic surveillance has been used, is being used, or will be used in the commission of the offense, or is leased to, listed in the name of, or commonly used by the individual committing the offense. *Giacalone*, 853 F.2d at 478 (citing 18 U.S.C. §§ 2518(3)(a), (b), and (d)). In determining whether the evidence supporting a wiretap warrant meets this probable cause standard, "there is no specific formula that must be met . . . , and . . . evidence must be judged on the totality of the circumstances and in a reasonable and common sense manner." *Giacalone*, 838 F.2d at 478 (quoting *Alfano*, 838 F.2d at 161) (internal citation omitted). The question that must be decided in issuing a warrant is whether there is probable cause to believe that a crime will be

---

[11]Brooks also asserts that the necessity requirement was not met because the affidavits contain boilerplate language regarding the adequacy of non-wiretap investigative techniques, reflecting a pure "cut and paste" job by the government from other matters. The defendant does not cite to any Sixth Circuit authority concerning an independent specificity element of the necessity requirement. At any rate, as detailed above, this argument is plainly without merit. The affidavits contain a significant amount of case-specific information and, therefore, cannot be "identical" to the affidavits allegedly submitted in other matters.

uncovered.  *Id.*  "Under this standard, certainty is not required at this stage, and the exact quantum of support required has frequently been described as 'a fair probability,' but more than a 'mere suspicion' that such evidence will be discovered."  *Id.*  Accordingly, "[f]acts can amount to a fair probability without being proof beyond a reasonable doubt or even a *prima facie* showing." *Id.*  Thus, "the preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination . . . . [A] magistrate's determination on the question of probable cause will not be reversed if the record contains a 'substantial basis for his probable cause findings.'"  *Giacalone*, 853 F.2d at 479 (internal citations omitted) (quoting *Alfano*, 838 F.2d at 162).

The Defendants contend that the evidence gleaned from the wiretap should be suppressed because the government failed to establish probable cause.  In support of this argument, Brooks contends that the applications improperly relied on uncorroborated information from confidential informants whose credibility was not verified and that the information supporting probable cause was stale.  With respect to the First Application, Pettus contends that it failed to establish probable cause that any of the target subjects committed or were committing the alleged crimes or that particular communications concerning those alleged offenses would be obtained through interception of Newsome's phone.

(1)     Confidential Sources

With respect to confidential sources, the Defendants point out that the affidavits contain the following conclusory statements concerning the reliability and veracity of the confidential sources: "CS [X] has been found to be reliable and credible by the agents who interviewed him/her.  Those agents have found no instances where CS [X] was untruthful or attempted to

25

deceive them." (*See, e.g.*, First Affidavit ¶ 23.)  The Defendants therefore argue that "[n]o facts were given to the issuing judge to show that these confidential sources were reliable and/or credible." (Docket No. 686 at p. 43.)  Furthermore, the Defendants point out the affidavits do not state that any of these informants provided information leading to conviction in other matters, nor do they provide any information concerning the length of the relationship between the affiant and each source.

Before issuing a warrant based on hearsay information provided by confidential sources, the issuing judge must have evidence that establishes the veracity and basis of knowledge of those sources.  *United States v. Williams*, 224 F.3d 530, 532 (6th Cir. 2000).  Where, as here, a warrant affidavit provides no indicia of an informant's reliability, the affidavit must contain substantial independent police corroboration.  *United States v. Frazier*, 423 F.3d 526, 532 (6th Cir. 2005); *see also United States v. Patrick*, No. 1:08-CR-130, 2009 WL 1766259, at *3-*4 (E.D. Tenn. June 23, 2009) (applying *Frazier* standard to review of wiretap application).  The affidavit "should be judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added."  *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000).

Independent police corroboration can take many forms.  For instance, a single police-monitored controlled purchase of drugs by the informant provides sufficient independent corroboration of an informant's reliability.  *United States v. Coffee*, 434 F.3d 887, 891-96 (6th Cir. 2006) (finding that probable cause was established where informant conducted a controlled purchase of drugs from alleged drug distributor subject to warrant application); *United States v. Gunter*, 266 Fed. App'x 415, 417-418 (6th Cir. 2008) (finding that the reliability of an informant was established where informant conducted two controlled drug purchases from alleged drug

distributor, because "[i]f one such purchase was sufficient to corroborate an informant's statements in *Coffee*, then two purchases will more than suffice in the instant case"); *United States v. Jackson*, 470 F.3d 299, 307-08 (6th Cir. 2006) (controlled purchase of drugs by unnamed confidential source demonstrated reliability of informant, and, therefore, the "magistrate's finding of probable cause was based on the affiant's personal knowledge and observations, rather than hearsay of the informant.")

Similarly, where an informant provides information that is consistent with information already independently known to the affiant, or where subsequent investigation confirms the information provided by the informant, the reliability of the informant may be established. *See United States v. Tuttle*, 200 F.3d 892, 894 (6th Cir. 2000) (finding that reliability of informant was independently corroborated, where informant's tip that defendant was utilizing stolen parts at auto shop was consistent with information already independently known to law enforcement); *United States v. McNally*, 327 Fed. App'x 554, 557-78 (6th Cir. 2009) (where informant alleged that defendant was involved in child pornography, independent corroboration of informant's reliability was established where investigator independently verified the alleged residential and business addresses of the defendant, his alleged employer, and the alleged existence of restraining order against him in favor of the informant).

Here, there is ample evidence that the investigators independently corroborated many of the details provided by the confidential sources in support of the First Affidavit, and by extension the Second and Third Affidavits. For example, after CS-6 asserted that the firearm used to kill Michael Goins was located at a particular residence, CS-6 conducted a monitored, controlled purchase of the firearm at that location, and the investigators independently verified that the

firearm was utilized in the Goins homicide. Similarly, CS-6 engaged in a monitored, controlled purchase of drugs from defendant Jones. Even standing alone, these acts demonstrated CS-6's reliability. Furthermore, after CS-6 contended that Goins was shot in retaliation for the shooting of Piru Bloods member Lampkins by Goins' affiliates, investigators confirmed that Lampkins in fact had been shot approximately three weeks before the Goins homicide. CS-2 and CS-6 also both gave consistent accounts concerning the circumstances of the Pullen homicide, including dates and locations for the incident that were consistent with independent data regarding when and where the homicide occurred. Moreover, as to this homicide, both CS-2 and CS-6 described the shooter as carrying an AK-47-type firearm, which investigators independently determined carried the same type of ammunition that was found at the Pullen homicide scene. CS-6 also provided accurate information concerning the location of defendant Gaddie, who was subject to outstanding arrest warrants, leading to Gaddie's arrest and the recovery of a firearm utilized in the Goins homicide. CS-6 and CS-5 also provided information concerning the Franklin homicide consistent with the date and location where it occurred and with certain eyewitness accounts. These examples provide ample basis for the Issuing Judge to have concluded that at least some of the confidential sources were reliable based on independent corroboration, particularly with respect to CS-6, who was the government's key informant.

Moreover, some of the information provided by the confidential sources included firsthand observations, not hearsay. For example, CS-6 claims to have witnessed the Goins homicide and to have participated in a meeting in which defendant Allen receive a rank upgrade for murdering Goins. Similarly, CS-5 contends that he was present with defendant Newsome and others when the Franklin murder occurred, and both CS-2 and CS-6 claim to have witnessed

defendant Allen carrying an AK-47-type assault rifle at the time and location of the Pullen homicide.

Thus, the court finds that, under the totality of the circumstances, the First Affidavit presented sufficient information to demonstrate the veracity and reliability of the confidential sources. The Second and Third Affidavits incorporated by reference the information presented in the prior applications,[12] and included paragraphs restating the reliability of CS-6 before he/she ceased to be utilized as an informant. (*See, e.g.*, Second Affidavit ¶ 14-15.) Because the previous information related to the activities of both Williams and Newsome, it was permissible for the court to rely on information provided by the confidential sources in reaching its probable cause determinations as to phones utilized by Williams and Newsome.

The Fourth Affidavit, which sought to tap only Bartlett's phone, again presents a closer question. Unlike the previous affidavits, the Fourth Affidavit does not explicitly identify the corroborating information provided by one or more of the sources allegedly linking Bartlett to criminal activity. The Fourth Affidavit does not even state that CS-8 or CS-9 provided information related to Bartlett, the Gallatin Piru Bloods, or the proposed Chattanooga set of Piru Bloods. On the other hand, CS-7 made at least two statements to authorities that were consistent with data obtained independently by law enforcement, specifically: (1) that Williams was the leader of the Eastside Skyline Piru Bloods, which information gleaned from previous recordings and wiretaps demonstrated; and (2) that Williams was seeking to establish a Chattanooga branch

---

[12]Without citation to any legal authority, the Defendants contend that the government impermissibly purported to incorporate information presented in the prior affidavits by reference. The court rejects this position, which is unsupported and would be, in any case, demonstrably inefficient.

of the Piru Bloods, which evidence recorded on previous wiretaps also demonstrated.  Although it is a close question, granting great deference to the Issuing Judge's decision, the court finds that the government presented the Issuing Judge with the requisite minimal showing that CS-7 was credible.

(2) Staleness

The Defendants contend that the information supporting TT1 was stale.  They point out that one of the allegedly gang-related homicides occurred in 2006, approximately four years before the First Application.  In response, the government contends that the First Affidavit established an ongoing pattern of criminal activity by the Piru Bloods between May 2006 and late 2009, demonstrating that the evidence was not stale.

The standard of review for a staleness determination is the same as the standard for determining the sufficiency of an affidavit.  *Greene*, 250 F.3d at 480.  Accordingly, the court should apply a "totality of the circumstances" analysis and should not impose an arbitrary time limitation within which discovered facts must be presented to a magistrate.  *Id.*  Allegations of ongoing criminal activity will generally defeat a claim of staleness.  *Greene*, 250 F.3d at 481; *United States v. Gray*, 372 F. Supp. 2d 1025, 1040 (N.D. Ohio 2005) (rejecting argument that evidence over six months old was stale, because alleged criminal activity was ongoing), *aff'd* 521 F.3d 514 (6th Cir. 2008); *see also United States v. Urban*, 404 F.3d 754, 774 (3d Cir. 2005) (finding that evidence supporting wiretap was not stale because "[w]here the facts adduced to support probable cause describe a course or pattern of ongoing or continuous criminality, the passage of time between the occurrence of the facts set forth in the affidavit and the submission of the affidavit itself loses significance.")

Here, based on a fair reading of the entire affidavit, the information contained within the First Affidavit was not stale. First, the affidavit indicates that authorities gathered evidence regarding ongoing criminal activities by the Piru Bloods, including Newsome, through at least February 11, 2010, less than a month before the First Application. Thus, the Issuing Judge was presented with current evidence of ongoing criminal activity involving the owner of the target telephone. Second, the allegations in the affidavit establish an ongoing pattern of criminal activity by the Piru Bloods, including Newsome, that may have involved certain earlier offenses such as multiple homicides and drug trafficking. Accordingly, even though the First Application relied in part on evidence that was two or more years old, the alleged ongoing criminal activity of the Piru Bloods defeats the claim of staleness as to that evidence. Finally, as noted above, CS-6 demonstrated his/her reliability with regard to earlier offenses, including the 2006 and 2008 homicides, permitting the court reasonably to rely on CS-6's contention that Piru Bloods members, including Jones, Pettus, House, and Newsome, were continuing to engage in gang-related criminal activity, such as drug trafficking.

Evidence supporting the Second, Third, and Fourth Applications included information gleaned from the previous wiretaps just days or weeks before each application was submitted, in addition to the independent evidence previously obtained. Thus, evidence concerning those applications was not stale either. *Gray*, 372 F. Supp. 2d at 1040 (rejecting staleness argument where challenged wiretap included evidence from 30-day interception period and other evidence derived independently).

(3)     Probable Cause Concerning the Investigatory Targets

The applications and associated affidavits contend that the investigatory targets committed

or would commit one or more of several offenses, including, *inter alia*, murder, conspiracy to commit murder, attempted murder, drug trafficking, money laundering, conspiracy to commit violent crimes in aid of racketeering, and utilizing firearms in furtherance of the conspiracy. The Defendants contend that there was not probable cause to believe that at least some of the investigatory targets had committed or would commit one of the alleged offenses, either directly or by aiding and abetting.

Although the Defendants urge the court to adopt a line-by-line analysis of the affidavits supporting each application, the court must analyze the affidavits in a common sense manner, based on the totality of the circumstances. Under that approach, each application was supported by probable cause.

(a)     First Affidavit

The First Affidavit details the activities of a multitude of Piru Bloods members, led by Newsome and Williams. It outlines how the Piru Bloods, at the direction of their leaders, allegedly engaged in reprisal killings of rival gang members, drug trafficking, violent initiation rites for new members, the use of firearms in support of the criminal operation, and coordinated efforts to conceal weapons utilized in the criminal operation, among other activities. The evidence supporting the First Affidavit demonstrated Newsome's stewardship of the criminal operation, such as his coordination of drug trafficking by Jones. CS-6, a reliable informant, also asserted that the Piru Bloods were continuing to engage in criminal activity, including drug trafficking for which Newsome was providing protection services. Although the First Affidavit does not reflect the entire scope of the alleged conspiracy, all of its participants, or all of the specific links between the alleged criminal activities and Newsome, that does not render the

affidavit lacking.  Indeed, it was precisely in an effort to gain this information that the government needed the wiretap.  Thus, the court finds that the Issuing Judge was presented with a substantial basis to find that government had more than a "mere suspicion" that Newsome – and at least some of the targets – had engaged in and/or would continue to engage in one or more of the alleged offenses.  Moreover, as the telephone toll analysis and consensual recordings demonstrated, Newsome was in frequent contact with known gang members and narcotics traffickers and discussed gang-related activity on his cell phone.  Thus, reading the affidavit in a reasonable and common sense manner, the Issuing Judge could reasonably have found probable cause to believe that incriminating communications would be intercepted on Newsome's cell phone.  *See Giacalone*, 853 F.3d at 479-80; *United States v. Dadanovic*, Crim. No. 09-63-ART, 2010 WL 3620251, *7-9 (E.D. Ky. Sept. 10, 2010) (finding that probable cause was satisfied where recorded calls reflected named interceptee's potential involvement in drug trafficking and registers reflected frequent contacts with other members of the alleged scheme).

(b)      Second, Third, and Fourth Affidavits

As an initial matter, Brooks contends that the remaining applications improperly relied on evidence unlawfully gathered pursuant to the prior wiretaps and that the Issuing Judge improperly adopted the affiants' interpretations of intercepted communications.  First, having determined that the first wiretap was lawful, the court finds that it was appropriate for the Issuing Judge to rely on information obtained in the first wiretap in determining whether the subsequent wiretaps were adequately supported.  *See Gray*, 372 F. Supp. 2d at 1040.  Second, as to the affiants' interpretations of the intercepted communications, Brooks does not cite to any legal authority on this issue.  At any rate, the summaries of conversations provided by the affiant include a mix of

summary information and transcript references, along with the affiants' interpretations of certain jargon contained within the recordings to the extent the meaning of the recordings was not already self-evident. Although the definitive interpretation of whether these statements are incriminating is ultimately a decision for the jury to make, the affiants' interpretations generally appear to be plausible, at a minimum. Accordingly, granting appropriate deference to the Issuing Judge, the court finds that the Issuing Judge could reasonably have relied on the summaries and excerpts of discussions provided by the affiants in reaching a probable cause determination.

The Second Affidavit, which added Williams as an interceptee, established the requisite probable cause to believe that both Williams and Newsome had committed or would commit at least one of the alleged offenses. In addition to independent evidence linking Williams to at least one gang-related homicide and ongoing drug trafficking, evidence gleaned from the first wiretap reflected Williams' continued participation in violent criminal activity, including an intent to "knock off" a suspected police informant and to broker a dispute in which one Piru Bloods member was threatening to shoot another one. Similarly, in addition to the evidence justifying the initial wiretap, the wiretap recorded Newsome discussing a robbery he may have committed, two gang-related shootings, and the potential reprisal against a gang member suspected of being a police informant.

The Third Affidavit, which related to Williams and Newsome, also established the requisite probable cause. In addition to evidence previously adduced, it included wiretap discussions involving Newsome concerning continued reprisal killings, robberies, and narcotics trafficking, a conversation between Williams and Pettus concerning drug trafficking, and a conversation between Newsome and Williams about providing a gun to a Piru Bloods member to

34

use against someone who had robbed that member.

The Fourth Affidavit also established probable cause for the wiretap of Bartlett's phone. Evidence indicated that Bartlett was a leader of a Gallatin set of Eastside Skyline Piru Bloods and that Bartlett was in frequent telephone contact with various local Piru Bloods leaders, including Williams (head of the Nashville Eastside Skyline Piru Bloods) and Newsome (head of the Nashville Tree Top Piru Bloods). Furthermore, Bartlett was recorded discussing a joint Eastside Skyline and Tree Top Piru Bloods meeting in which Bartlett identified several members who had not attended out of fear of being beaten for violations of gang rules. Bartlett was also recorded discussing with Williams, his Nashville East Skyline Pirus counterpart, the creation of a Chattanooga branch of the Eastside Skyline Pirus, which Williams and Bartlett would lead. Furthermore, Bartlett was in recent telephone contact with several known participants in the Piru Bloods criminal conspiracy, including Williams, Newsome, Allen, and Dowell. Substantial evidence presented to the Issuing Judge in earlier applications had demonstrated these individuals and other members of local sets of the Piru Bloods had engaged and were continuing to engage in various forms of criminal activity. Thus, the Issuing Judge was presented with evidence that Bartlett associated with local Piru Bloods leaders, participated in and was aware of activities involving the Nashville-based Piru Bloods sets, was a current leader of the Gallatin set of the Piru Bloods, and seeking to become the prospective leadership of the Chattanooga Piru Bloods, and was likely privy to information concerning criminal activities involving one or more of these Piru Bloods sets. Accordingly, the court finds that the Issuing Judge was presented with a substantial basis to find that request for a wiretap of Bartlett's phone was supported by probable cause.

**CONCLUSION**

For the reasons stated herein, the motion is **DENIED**.

Enter this 2nd day of December, 2011.

ALETA A. TRAUGER
United States District Judge